[No. D010952. Fourth Dist., Div. One. May 17, 1991.]

CONRAD SCHMITT et al., Plaintiffs and Appellants, v.
INSURANCE COMPANY OF NORTH AMERICA, Defendant and
Appellant.

**COUNSEL**

Hammett & Whitson, Fred U. Hammett, Jr., Harrigan, Ruff, Ryder & Sbardellati and Sean T. O'Bryan for Plaintiffs and Appellants.

Regal & Levy and Leonard S. Levy for Defendant and Appellant.

**OPINION**

TODD, J.—Insurance Company of North America (INA), surety on a licensed motor vehicle dealer's bond, appeals a money judgment entered against it after a trial by the court sitting without a jury. The court's ruling against INA was on the theory it breached its duty to both claimants and principals on the bond to act in good faith on a bond claim, including a duty

of paying claims as they arose and reasonably investigating claims regarding the question of coverage and the question of the obligation to pay. The judgment runs in favor of Conrad Schmitt and Charles Sackett (sometimes referred to as claimants) as well as Daniel Martin and Michael Juneau (sometimes referred to as principals) in the principal amount of $157,225 plus costs of $2,178.75 and attorney's fees of $177,200, together with interest.

INA makes numerous contentions of error, including:

(1) The essential conditions for liability of a surety under a motor vehicle dealer's bond were not established by the evidence and consequently the court erred as a matter of law when it ruled that there was coverage under the bond;

(2) INA has been exonerated by the claimants' covenant not to execute upon an interim judgment it obtained by default against the principals;

(3) The trial court improperly broadened INA's duty to the bond principals;

(4) The admission of the testimony of claimants' and principals' alleged experts is reversible error;

(5) Damages awarded were excessive as a matter of law; and

(6) The principals must indemnify INA.

Claimants and principals cross-appeal a determination of the trial court that claims for violation of Insurance Code section 790.03 are time-barred as to all parties and that claims for punitive damages and emotional distress are time-barred as sounding exclusively in tort pursuant to *Frazier* v. *Metropolitan Life Ins. Co.* (1985) 169 Cal.App.3d 90, 105-107 [214 Cal.Rptr. 883].

Finding merit in certain of INA's contentions under rules of law applicable to the surety-principal relationship and in the context of the motor vehicle dealer's bond and facts involved in this case, we reverse the judgment with directions to dismiss the cause of action for breach of the covenant of good faith and fair dealing, and we remand for further proceedings in connection with INA's cross-complaint on the principals' agreement to indemnify INA. In light of this disposition, there is no need for more than a brief discussion of issues relating to other aspects of the case, including the cross-appeal.

## FACTS[1]

In 1979, Michael Juneau and Daniel Martin owned and operated a licensed motor vehicle dealership doing business as J & M Auto Sales and Century Motors. As required in order for Juneau and Martin to obtain a motor vehicle dealer's license from the Department of Motor Vehicles (DMV) and pursuant to Vehicle Code[2] section 11711, INA issued them a standard used-car dealer's bond effective for a one-year period commencing October 3, 1978. The surety bond had a $5,000 penal sum and its principals were Juneau & Martin, Inc., J & M Auto Sales and Century Motors.[3] The bond covered Juneau and Martin individually as if they were bond principals. In connection with the issuance of the bond, Juneau and Martin, individually, and Juneau & Martin, Inc., doing business as Century Motors, executed a general agreement of indemnity.

In August 1979, a 1978 Volkswagen automobile (VW) was owned by Bob Inbody. On August 20, Richard Archibald, whose place of business was called Auto Rebuilders, gave a bill of sale for the VW to Richard C. Moeller. On that date, Moeller applied to DMV for registration of the VW, attaching the necessary certificates pertaining to brake and lamp adjustments and pollution control. On October 6, 1979, a valid certificate of ownership was issued to Moeller.

In the meantime, on September 12, 1979, Charles Sackett gave a check for $8,500 to Juneau at Century Motors to purchase the VW and another vehicle. The check was payable to Inbody. The VW was located at Auto Rebuilders where it was being repaired. Sackett went there to examine it. Sackett knew on September 12, 1979, the VW was owned by Inbody and was in Archibald's possession.

Juneau gave the check to Inbody who negotiated it and kept the proceeds. Only $4,600 of the proceeds of the check was intended to be the full purchase price of the VW, which was inoperable at the time.

Later, Conrad Schmitt purchased Sackett's interest in the VW. Sackett told Schmitt the status and location of the VW and the facts as to the payment of

---

[1]The parties stipulated to most of the facts pertaining to the surety bond and indemnity agreement in question as well as the underlying transactions with respect to the particular vehicle.

[2]All statutory references are to the Vehicle Code unless otherwise specified.

[3]Although the parties' stipulated facts include Century Motors as a principal and party to an indemnity agreement, the documents entered in evidence include that fictitious name as a party to the documents only by way of an addendum dated March 21, 1979, denoting that the principal's name is changed to Juneau & Martin, Inc., dba: Century Motors.

the purchase price as above described. Sackett requested Juneau to provide him with motor vehicle title documents to the VW.

Schmitt requested of Archibald and obtained from him a purported bill of sale for the VW. The bill of sale contained an incorrect vehicle identification number. Archibald later gave possession of the VW to Moeller who had already begun the DMV processing leading to Moeller's obtaining the registration on October 6, 1979.[4]

No dealer's notice of transfer pursuant to section 5901 was filed by Juneau or Martin in connection with the transaction relating to the VW.[5] None of the parties, Juneau, Martin, Schmitt, or Sackett, was able to obtain possession or title to the VW. Neither Schmitt nor Sackett was ever repaid the $4,600 for the purchase of the VW.

---

[4]While the stipulated facts state that Archibald "subsequently," i.e., after September 12, 1979, sold the VW to Moeller, the trial court, without objection, accepted and applied the Archibald-to-Moeller transfer date of August 20, 1979, which is the date reflected in the documentary evidence in the case. Pursuant to the stipulation and this state of the record, we view the facts to be that Moeller's possession of the VW and the issuance of its registration to him occurred after September 12, 1979.

[5]Section 5901 provides, in part: "(a) Every dealer or lessor-retailer, upon transferring by sale, lease, or otherwise any vehicle, whether new or used, of a type subject to registration under this code, shall, not later than the end of the fifth calendar day thereafter not counting the day of sale, give written notice of the transfer to the department at its headquarters upon an appropriate form provided by it.

". . . . . . . . . . . . . . . . . . . . . . . .

"(c) When the dealer or lessor-retailer is not in possession of the vehicle that is sold or transferred, the person in physical possession of the vehicle shall give the information required by subdivision (b) [relating to mileage disclosure].

"(d) A 'sale' shall be deemed completed and consummated when the purchaser of that vehicle has paid the purchase price, or, in lieu thereof, has signed a purchase contract or security agreement, and taken physical possession or delivery of that vehicle."

Barbara Folkes, registration manager for a local DMV office, testified for the plaintiffs that had a notice of transfer been received from the dealer pursuant to the five-day requirement of section 5901 and it showed a transferee different from Moeller, DMV would have notified the parties and withheld documents of registration and title until the matter was settled through agreement or litigation.

Linda Stanley, manager of DMV's lien sale unit in Sacramento, testified for the defense that the section 5901 notice of transfer "deals with releasing of financial responsibility of a vehicle. It is not a titling document." Stanley testified that if the section 5901 notice of transfer is not submitted with an application for title, it has no effect on whether the title can go through and that even if a dealer had filed the notice of transfer in 1979, Moeller would still have been issued title.

Stanley acknowledged, however, that if DMV became aware of competing claims of title to the same vehicle, it would offer the parties a 15-day courtesy stop to issuing the transfer document so that a court order might be obtained in that interval stopping the transfer. Also, DMV would stop any further processing if it discovered it had issued two registrations for the same vehicle.

Sometime in early 1980, Archibald was arrested and later convicted for grand theft in connection with the fraudulent double selling of motor vehicles.

In October 1980, Fred U. Hammett, Jr., attorney for Schmitt and Sackett, made a claim against INA on Juneau and Martin's bond for the damages suffered by his clients. On June 19, 1981, INA unequivocally denied the claim by a letter stating, in part, "Based on what has been submitted to date, we can find no coverage." INA did not contact Juneau and Martin concerning this matter for years. However, Hammett wrote Juneau and Martin in June 1982 and said he was suing INA because of its nonpayment. In May 1983, Hammett gave Juneau and Martin their first notice INA had definitively denied the claim.

In the interim, sometime before April 2, 1981, Schmitt and Sackett had sued Juneau and Martin, among others, in San Diego Superior Court case No. 452862. On May 10, 1983, Hammett wrote Juneau and Martin telling them he did not believe they should be personally responsible for payment; rather, INA should be responsible. Hammett proceeded to tell Juneau and Martin about INA's refusal to pay and his decision to request default in the pending action, thus leaving "INA with the question of whether they will or will not pay the claim, once judgment has been entered against their insureds."

As Hammett predicted in his May 10, 1983, letter to Juneau and Martin, INA did nothing in response to being notified of this plan of action, and in December 1984 Schmitt and Sackett took a default judgment against Juneau and Martin and Century Motors for a total of $157,225, consisting of $5,600 compensatory damages, $1,309 interest, $316 costs and $150,000 punitive damages. After the default judgment was entered, Juneau and Martin assigned all of their rights against INA to Schmitt and Sackett. The May 10, 1985, assignment included an agreement not to execute, reading:

"In consideration of the assignment set forth herein above, Assignees agree that they shall proceed against said insurance company for collection of the total amount of the judgment, and agree not to execute on the judgment against Assignors or further pursue or prosecute any action against said Assignors requiring payment of said judgment from personal assets."

On June 19, 1985, Schmitt, Sackett, Juneau, and Martin filed the present suit against INA including claims for tortious breach of the covenant of good faith and fair dealing and violation of Insurance Code section 790.03. The trial court held the statute of limitations began to run as to Schmitt and

Sackett on June 19, 1981, when INA notified Hammett of its denial of the claim, and as to Juneau and Martin on May 10, 1983, when Hammett told them INA had denied the claim. Accordingly, it held claims for violation of Insurance Code section 790.03 were time-barred as to all parties, and claims for punitive damages and emotional distress are time-barred as sounding exclusively in tort pursuant to *Frazier* v. *Metropolitan Life Ins. Co., supra,* 169 Cal.App.3d 90, 106-107. Thus, the court permitted the parties only consequential damages arising out of the breach of the covenant of good faith and fair dealing and arising out of the breach of contract. On this theory the court entered judgment against INA in the amount of the earlier $157,000 default judgment against Juneau and Martin, plus attorney's fees, costs and interest totaling over $179,000.

In its statement of decision, the trial court found INA had a duty to act in good faith insofar as acting on the bond claim, including "paying claims that arose, [and] reasonably investigating claims regarding the question of coverage and also the question of the obligation to pay." The court recognized Juneau and Martin as principals did not have the right to have the surety defend claims or lawsuits brought against the principal by claimants, but "do have a right to the specific benefits under the contract." The court went on to state the factual and legal basis of its ruling INA breached its duty to act in good faith, as follows:

"It is clear that following notification to I.N.A. of the claim by way of letter from Mr. Hammett on October 3, 1980, that Mr. Straily [INA's claims supervisor] had telephone contact with Mr. Hammett's office and assigned Mr. Anderson [INA's field adjuster] to investigate the claim. In a memo dated April 2, 1981 to Mr. Straily, Mr. Anderson indicated that he had talked to Mr. Hammett and obtained information regarding the address of the bond principals, Martin and Juneau, and had learned that Mr. Hammett has sued Martin and Juneau and was in the process of taking a default that would not be set aside. In a follow-up memo dated April 8, 1981, Straily indicated to Anderson that he should continue to try and find the bond principals. Straily acknowledged that I.N.A. would not have defenses available to the principal if a default was entered as indicated. Straily indicated that he did not find any *written* contract with the bond principal's name on it, and therefore the bond claim should be refused. It is true that provision (a)(1) of § 11711 of the Vehicle Code provides that fraud in a writing is one of the criteria for causing an auto dealer/retailer's bond to respond.[6] However, subsection

---

[6]Section 11711, subdivision (a)(1), gives a cause of action on the dealer's bond to any person who "shall suffer any loss or damage by reason of any fraud practiced on him or fraudulent representation made to him by a licensed dealer or one of such dealer's salesmen acting for the dealer, in his behalf, or within the scope of the employment of such salesman

(a)(2) of § 11711 says that if there is a loss or damage by reason of violation by a dealer or salesman of any of the provisions of Division 3 which include §§ 5901 and 4456 of the Vehicle Code that there is also a duty to respond. The latter section says nothing about a writing. For reasons that are not explained, the evidence suggested that Mr. Straily was under the impression at the time of the claim that a writing was required as a predicate for a successful claim on an auto dealer bond. Mr. Straily reiterated that thought in a letter dated May 5, 1981 to Mr. Hammett. On May 22, 1981, Mr. Straily wrote Mr. H. Leslie Myers who was the home office bond claim manager and indicated that the claim should be denied because the bond principal's name does not appear on any written document. Mr. Myers wrote back and said that he reviewed the file and agreed with the observation that the claim against the bond was not supported by the evidence submitted. For the reasons indicated above, the analysis made by Straily was incorrect. Mr. Myers did not testify and Mr. Straily did not explain his reasons for denying the claim when he testified. Mr. Regal [contacted by INA in May or June 1981 and requested to prepare a letter] was of the opinion that the claim was not covered by virtue of the fact that the retail dealer was not the title holder of the vehicle who was the seller within the Commercial Code definition of that term. I.N.A. has produced absolutely no legal authority for the proposition that the transaction contemplated by the Vehicle Code as being covered under this bond had to be a formal 'sale' that is recognized by the Commercial Code in order to invoke coverage under the bond. If such an argument were the basis for denying coverage, then the carrier had an obligation to come forward and establish a recognized legal predicate for that position. I.N.A. has not done so, and the denial of coverage was unreasonable and in bad faith. This notwithstanding, I.N.A.'s asserted position is that custom and practice in the bond community is to the contrary. If custom and practice were to be a basis for denial of a claim, it would have to be based on sound legal authority.

"As indicated, had I.N.A. recognized its obligation under the bond this entire claim brought by Sackett and Schmitt against Martin and Juneau and

---

and such person has possession of a written instrument furnished by the licensee, containing stipulated provisions and guarantees which the person believes have been violated by the licensee . . . ."

Cases have stated: "A reading of section 11711 readily discloses that in order to recover for loss or damage by reason of any fraud practiced on him or fraudulent representation made to him by a licensed bonded dealer, the plaintiff must have a writing furnished by the licensee containing stipulated provisions and guarantees which plaintiff believes have been violated by the licensee." (*Krebs* v. *Travelers Indem. Co.* (1961) 192 Cal.App.2d 83, 85 [13 Cal.Rptr. 352]; *Goggin* v. *Reliance Ins. Co.* (1962) 200 Cal.App.2d 361, 365 [19 Cal.Rptr. 446].)

The *Goggin* case notes section 11711 also contains the provision we consider here, subdivision (a)(2), providing "that a plaintiff may recover for any loss or damage due to the licensee's violation of any of the provisions of division 3 of the Vehicle Code . . . ." (*Goggin, supra,* 200 Cal.App.2d at p. 365.)

all of the other sequelae of the denial of this claim could have been avoided. Sackett and Schmitt were entitled to have this claim paid in a timely fashion, and that was not done. I.N.A., under the evidence presented, had an obligation to Martin and Juneau to honor a valid claim, to investigate the claim, and to make contact with Martin and Juneau. It does not appear that the failure to communicate with Martin and Juneau had anything to do with I.N.A.'s misanalysis of the coverage. I.N.A. had sufficient information independent of their contacting Martin and Juneau to make a judgment that there was coverage. However, under the terms of the bond and the indemnity agreement, I.N.A. had the obligation to investigate all claims against the bond and had the right to control the defense on such a bond claim if they wished. They also were attorneys in fact for their insured. The privileges given I.N.A. insofar as controlling the defense also gave them the obligation to communicate with their insured and explain the company's position and the concomitant obligations and effects that the company's position had upon its bond principal. Notwithstanding protestations to the contrary, the evidence suggests that no legitimate effort was made to contact Martin and Juneau."

Thus, based on its determination INA breached its duty under section 11711, subdivision (a)(2), relating to loss due to a dealer's failure to comply with notification requirements of the code, the court caused judgment to be entered against INA and in favor of the principals and claimants ultimately exceeding $336,000.

## DISCUSSION

### I

### INA's APPEAL

The specific portion of section 11711 on which the trial court relied to establish INA's liability under the surety bond reads:

"(a) . . . (2) if any person shall suffer any loss or damage by reason of the violation by such dealer or salesman of any of the provisions of Division 3 (commencing with Section 4000) of this code . . . then any such person shall have a right of action against such dealer, his salesman, and the surety upon the dealer's bond, in an amount not to exceed the value of the vehicle purchased from or sold to the dealer."[7]

---

[7]Section 11710 imposes a surety bond requirement in order to obtain a dealer's license and reads in part as follows: "(a) Before any dealer's or remanufacturer's license is issued or renewed by the department to any applicant therefor, the applicant shall procure and file with

The trial court further relied on the principals' violation of sections 4456 and 5901, both containing specific requirements of notification to DMV upon a dealer "selling a vehicle" in the case of section 4456[8] or "transferring by sale, lease, or otherwise any vehicle" in the case of section 5901.[9]

INA urges several grounds for reversal relating to matters such as whether substantial evidence would support a conclusion there was a "sale" by Juneau and Martin; whether any violation of the notification of transfer requirements could have been a cause of loss to Schmitt and Sackett because, for example, the necessary certificates for issuance of registration, i.e., for smog, brake and light adjustments, were impossible to obtain since the VW never was in the possession of Juneau and Martin; or whether there could be any such causation because even if Juneau and Martin had given the notices this would not have prevented Moeller from obtaining title and prevailing as a bona fide purchaser for value. ██ ██ However, we do not address those questions.[10] ██ Instead, we apply principles of the law of surety in the context of the law otherwise applicable to this case and reach the conclusion a lawsuit for breach of the covenant of good faith and fair dealing was unavailable to the plaintiffs.

the department a bond executed by an admitted surety insurer, approved as to form by the Attorney General, and conditioned that the applicant shall not practice any fraud or make any fraudulent representation which will cause a monetary loss to a purchaser, seller, financing agency, or governmental agency."

[8]Section 4456 imposes a 20-day report-of-sale requirement and provides in pertinent part:
"(a) When selling a vehicle, dealers and lessor-retailers shall use numbered report-of-sale forms issued by the department. The forms shall be used in accordance with the following terms and conditions:
"(1) The dealer or lessor-retailer shall attach for display a copy of the report of sale on the vehicle before the vehicle is delivered to the purchaser.
"(2) The dealer or lessor-retailer shall submit to the department an application accompanied by all fees and penalties due for registration or transfer of registration of the vehicle within 20 days from the date of sale . . . .
" . . . . . . . . . . . . . . . . . . . . . .
"(6) The dealer or lessor-retailer shall report the sale pursuant to Section 5901."

[9]For pertinent text of section 5901, see *ante*, page 250, footnote 5.

[10]Viewing the record in support of the judgment, as we must, (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]) the trial court's conclusion there was a retail transaction within the application of section 11711, though not necessarily a "sale," is supported by the evidence of the retail dealer principals' acceptance of Sackett's check, at the dealer's business premises, in payment for the purchase price of a particular car, the VW, followed by the principals' delivery of the check to the payee, Inbody, who owned the VW.
Similarly, there is no showing it would have been impossible for the principals to have complied with the notice requirements of sections 4456 and 5901 simply because the VW itself was not then in the principals' possession. In light of the testimony of DMV experts Folkes and Stanley, the trial court could have found the principals' compliance with the notice requirements would have prevented the loss to Schmitt and Sackett by stopping completion of Moeller's registration and thus that the principals' noncompliance was a cause of the loss.

The indemnity agreement signed along with the surety bond in question gave INA "the right to adjust, settle or compromise any claim, demand, suit or judgment upon the Bond[ ] . . . ." The indemnity agreement also appointed INA as the principals' "attorney-in-fact with the right, not the obligation, to exercise all of the rights of the Principal and indemnitors assigned, transferred and set over to the Surety in this Agreement . . . ." Looking to these provisions of the indemnity agreement, the trial court concluded INA "had the obligation to investigate all claims against the bond and had the right to control the defense on such a bond claim if they wished. They also were attorneys in fact for *their insured*. The privileges given INA insofar as controlling the defense also gave them the obligation to communicate with *their insured* and explain the company's position and the concomitant obligations and effects that the company's position had upon its bond principal." (Italics added.) The trial court's view of the principal as an "insured" apparently forms the basis for its ultimate ruling applying ordinary "bad faith" law found in cases dealing with insurance contracts to this surety relationship.[11] The indemnity agreement's terms giving INA rights to defend and to act as the principals' attorney-in-fact, incidents of an ordinary surety-principal relationship, do not impose on the surety the additional obligations the trial court found and do not change that relationship to one of insurer-insured as the trial court apparently viewed the matter.

In *Lumbermens Mutual Casualty Co.* v. *Agency Rent-A-Car, Inc.* (1982) 128 Cal.App.3d 764, 769-770 [180 Cal.Rptr. 546], this court compared the nature of surety bonds (filed in connection with the financial responsibility law)[12] with basic liability insurance, and stated:

"A surety bond is not an insurance policy. [Citations.] It represents nothing more than 'an undertaking to indemnify a person, or the public, against losses resulting from acts of the principal. A surety guarantees payment up to the principal sum. But if losses occur, the surety may recover from its principal.' [Quoting *Farmers Ins. Exch.* v. *Midwest Emery Frgt. Sys., Inc.* (1974) 215 N.W.2d 623, 626.] *It merely constitutes a guarantee the surety will assume the principal's liability only if the latter is unable to make full payment. It cannot be construed as* providing any more, such as the *requiring of the surety* to undertake the defense or *to immediately pay the settlement without the principal's default.* [Citations.] In other words, '[a] liability insurance policy is written for the [financial] protection of the insured. However, a financial responsibility *bond does not protect the principal by*

---

[11]Discussing attorney's fees in its statement of decision, the trial court also said, ". . . Sackett and Schmitt and Martin and Juneau respectively are entitled to damages for establishing *insurance coverage* on these facts." (Italics added.)

[12]See section 16000 et seq.

*insuring him against liability.* A financial responsibility bond is written for the protection of the motoring public, who may be injured by the principal. *If the surety is compelled to make payment for damages caused by the principal, it has the right to seek reimbursement from the principal.* The . . . financial responsibility bond, in the present case, expressly provides for reimbursement by the principal. This fundamental difference between insurance and a financial responsibility bond compels this court to find that a financial responsibility bond is not insurance, as that term is used in . . . [Lumbermens' excess clause and section 11580.9].' (*Republic-Franklin Ins. Co.* v. *Progressive Cas. Ins. Co.* (1976) 45 Ohio St.2d 93 [341 N.E.2d 600, 602, 74 Ohio Ops.2d 202].)" (Italics added.)

Although the class of persons protected by the dealer's surety bond we consider (purchasers, sellers, financing agencies and government agencies (§ 11710, subd. (a)) differs from the class protected by the financial responsibility bond (the motoring public), the statements in *Lumbermens* concerning the nature of surety versus insurance are equally applicable. The surety's duty to pay arises only if the principal is unable to make full payment. The surety's duty does not extend any further. The bond does not insure the principal against liability. Moreover, if the surety is compelled to make payment for damages caused by the principal, the surety has the right to seek reimbursement from the principal.

██ "The risk of loss under a suretyship contract remains with the principal, while the surety merely lends its credit so as to guarantee payment in the event that the principal defaults. In the absence of default, the surety has no obligation." (1 Cal. Insurance Law & Practice (Matthew Bender, 1986) Surety Bonds Compared to Insurance, § 12.13 [2], p. 12-35, fn. deleted.)

The principles set forth in *Lumbermens* and California Insurance Law & Practice comport with the general statutory scheme concerning the position of sureties which establishes that the principal, not the surety, has the duty to perform the obligation. (Civ. Code, § 2832 et seq.) Civil Code sections demonstrating the primary obligation of the principal, with the right to reimbursement in the surety, as incidents of the surety-principal relationship include Civil Code section 2846 which permits a surety to "compel his principal to perform the obligation when due," section 2847 which provides that if the surety satisfies the principal obligation, "the principal is bound to reimburse what he has disbursed," and section 2848 which entitles a surety, upon satisfying the obligation of the principal, "to enforce every remedy which the creditor then has against the principal to the extent of reimbursing what he has expended . . . ." Moreover, when the liability of the principal

ceases, the liability of the surety also ceases. (Civ. Code, §§ 2809, 2810, 2819.)

■ With respect to official bonds, including those issued in conformity with sections 11710 and 11711, it is the rule:

"[A] surety on an official bond undertakes no liability for anything which is not within the letter of his contract. The obligation is *strictissimi juris*; that is, he has consented to be bound only within the express terms of his contract and his liability must be found within that contract or not at all. [Citation.] 'Where a surety bond is given pursuant to the requirements of a particular statute, the statutory provisions are incorporated into the bond.' (*Bank of America* v. *Dowdy* . . . [(1960) 186 Cal.App.2d 690, 692, 693.]" (*Krebs* v. *Travelers Indem. Co.*, *supra*, 192 Cal.App.2d 83, 85.)

■ The foregoing rules make it clear that it is not the duty of the surety to protect the principal as if the principal were an insured under an insurance policy. The surety's duty runs to the third party obligee, here a purchaser, seller, financing agent or government agent. (§ 11710, subd. (a).)

The conclusion flowing from these legal incidents of the surety-principal relationship involved in this case is that INA's nonpayment of the claims of Schmitt and Sackett did not give rise to a bad faith cause of action in the principals Juneau and Martin. Only the principals' failure to pay their legal obligation to Schmitt or Sackett would give rise to INA's liability on the bond. Until the principals' legal obligation to Schmitt or Sackett was fixed, there was no duty on the part of INA to pay under the bond. A corollary to this conclusion is that any denial of liability by INA before the principals' legal obligation was established could not give rise to a cause of action against INA on the bond or, a fortiori, for bad faith.

When was the legal obligation of the principals Juneau and Martin fixed? Under the facts of this case, until the entry of the judgment against the principals their legal obligation to pay for any loss to Schmitt and Sackett was not fixed. Schmitt and Sackett, through their attorney Hammett, informed Juneau and Martin on May 10, 1983, that they did "not believe that you should be personally responsible for payment to [Schmitt and Sackett], however, we do believe that your bonding company, Insurance Company of North America, should be responsible." Thus, the plaintiffs themselves expressed their belief in the nonliability of the principals as of that time. The entry of the default judgment against the principals thereby became the event which fixed their legal obligation to Schmitt and Sackett, and it gave rise to INA's duty as surety to pay that obligation if the principals failed to pay it. Before entry of the default judgment against Juneau and Martin, INA's

actions in connection with denying the claim of Schmitt and Sackett could not be deemed evidence of bad faith because no duty under the surety bond had yet become effective. In this record there is no substantial evidence of breach of the covenant of good faith and fair dealing pertaining to the approximate six-month period between December 1984 when the default judgment was entered and May 1985 when Juneau and Martin, under the agreement not to execute, assigned their rights against INA to Schmitt and Sackett in exchange for the release of the principals from further liability in the matter.

However, by June 1985 when Schmitt and Sackett attempted to enforce the liability of the surety as established by the default judgment and non-payment by Juneau and Martin, Schmitt and Sackett had taken the assignment from Juneau and Martin who were relieved of any further liability by virtue of Schmitt and Sackett's agreement not to execute against the principals. The assignment extinguished any obligation Juneau and Martin had to Schmitt and Sackett pertaining to the original transaction involving the VW. As of the date of the assignment, no further liability on the surety bond ran from INA to Schmitt and Sackett. (Civ. Code, §§ 2810, 2819.)[13] Thus, the bad faith causes of action of Juneau and Martin and of Schmitt and Sackett based on their assignment from Juneau and Martin cannot stand.

The parties have brought to our attention certain cases which apply Insurance Code section 790.03, relating to unfair business practices in the field of insurance, in the surety context. The cases do not aid the plaintiffs in this case. In *General Ins. Co.* v. *Mammoth Vista Owners' Assn.* (1985) 174 Cal.App.3d 810 [220 Cal.Rptr. 291], the court considered a surety bond given under Business and Professions Code section 11018.5, subdivision (a)(2)(A), for the faithful completion of a specific construction project by the developer, recreational facilities in the common area of the development to be completed by a date certain, October 1, 1973. The developer agreed to deliver to the homeowners association an owner's completion bond in an amount certain, guaranteeing completion of the facilities. The developer, as principal, and the surety executed a surety bond in favor of the named homeowners association in the amount of $42,350, conditioned on the faithful completion of the construction of the recreational facilities. The

---

[13]Civil Code section 2810 provides, in part, that a surety "*is not liable if* for any other reason there is no liability upon the part of the principal at the time of the execution of the contract, or *the liability of the principal thereafter ceases . . . .*" (Italics added.)

Civil Code section 2819 provides: "A surety is exonerated, except so far as he may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, in any way impaired or suspended."

developer did not complete the facilities on schedule; in fact, the developer never completed the facilities. Over a period of years after it received notice of the lack of completion of the project, the surety conducted deceptive and unfair settlement practices with the named obligee. (174 Cal.App.3d at p. 825.)

After pointing out that the unfair and deceptive acts and practices specified in Insurance Code section 790.03, subdivision (h), are "merely a codification of the tort of breach of the implied covenant of good faith and fair dealing as applied to insurance," (*General Ins. Co.* v. *Mammoth Vista Owners' Assn., supra,* 174 Cal.App.3d 810, 822) the court went on to hold that "one who issues surety bonds is in 'the business of insurance' and subject to the provisions prohibiting unfair and deceptive practices," (*id.* at p. 824) including section 790.03, subdivision (h). (*Id.* at p. 827.)[14]

*Mammoth Vista* must be read in the context of the particular tripartite relationship that existed from the very beginning of the execution of the owner's completion bond, one involving a specific project to be completed by a certain time and giving rise to reasonable expectations in all three parties involved concerning these known factors. The date and scope of nonperformance by the principal and the existence and extent of loss experienced by the named obligee due to the nonperformance are readily ascertainable in a case such as *Mammoth Vista.* A simple visit to the site after the date completion was due would have established the conditions necessary to give rise to the surety's obligation due to the principal's failure to complete the contract. As we have seen, these characteristics of a known, fixed obligation of the principal do not attend the failure of the principals Juneau and Martin to give the requisite notice of sale to the DMV.

The broad language of *Mammoth Vista* must be read in the context of the facts of that case, which are not analogous to the present case. Moreover, in *Mammoth Vista* there was no assignment from the principal to the obligee that would absolve the principal and thus the surety from liability. Thus, *Mammoth Vista* is inapposite.

In *Pacific-Southern Mortgage Trust Co.* v. *Insurance Co. of North America* (1985) 166 Cal.App.3d 703 [212 Cal.Rptr. 754], this court applied principles

---

[14]We note that since the decision in *Mammoth Vista* the Supreme Court has held "Neither [Insurance Code] section 790.03 nor section 790.09 was intended to create a private civil cause of action against an insurer that commits one of the various acts listed in section 790.03, subdivision (h)." (*Moradi-Shalal* v. *Fireman's Fund Ins. Companies* (1988) 46 Cal.3d 287, 304 [250 Cal.Rptr. 116, 758 P.2d 58].) Thus, the underlying rationale of the *Mammoth Vista* case is no longer valid. (See also *Zephyr Park* v. *Superior Court* (1989) 213 Cal.App.3d 833, 836-838 [262 Cal.Rptr. 106].)

of bad faith law applicable to ordinary liability insurance contracts to a case involving a commercial blanket bond indemnifying a lender for fraudulent acts committed by its employees. *Pacific-Southern* described the case as involving a trial which proceeded on the principal's "causes of action for breach of *the insurance contract* and breach of the implied covenant of good faith and fair dealing," (*id.* at p. 708, italics added) and went on to discuss and resolve such issues as the applicable statute of limitations, jury instructions and sufficiency of the evidence. *Pacific-Southern* does not discuss or consider the matter of the difference between the surety-principal relationship and the insurer-insured relationship. For this reason and from the fact *Pacific-Southern* describes the agreement it was there considering as an "insurance contract," and not otherwise, we can only conclude it dealt with such a contract, not a surety arrangement as here. Accordingly, *Pacific-Southern* does not furnish support for plaintiffs' argument in this case.

The same conclusion applies to *Downey Savings & Loan Assn.* v. *Ohio Casualty Ins. Co.* (1987) 189 Cal.App.3d 1072 [234 Cal.Rptr. 835] which dealt with a "Savings and Loan Blanket Bond" providing coverage for losses caused by the dishonest act of any of Downey's employees, up to a fixed amount, and promising to indemnify Downey for court costs and attorney's fees it incurred in defending any lawsuit brought by a third party arising out of the dishonest acts of Downey's employees. The defendant issuer of the bond had adopted standards for handling bond claims that were consistent with the standards of the insurance industry, including requirements notice of any occurrence was to be referred immediately to the claims department and, if the latter department's review "indicated the possibility of a claim, an adjuster was to be assigned immediately and an investigation commenced forthwith, requiring contact with the *insured* within 24 hours after an adjuster's assignment, and prompt contact with the allegedly dishonest employee." (*Id.* at p. 1083, italics added.) The court further described the bond involved in *Downey* as follows:

"The bond provided coverage for any loss incurred as a result of dishonest or fraudulent acts of any of Downey's employees. Under the bond, Ohio had the option of defending Downey or indemnifying it for court costs and attorney's fees incurred in the defense of a third-party which, 'if established against *the Insured*, would constitute a valid and collectible [*sic*] loss sustained by *the Insured* under the terms of the bond.'" (*Id.* at p. 1087, italics added.)

From the language of the court and the bond referring to Downey as the "insured" and from the terms of the bond giving coverage directly to Downey for attorney's fees and court costs, it is apparent there were sufficient incidents of an ordinary insurance contract involved in the bond

being considered in *Downey* to call for application of principles of bad faith actions used in cases involving policies of insurance.

We conclude the plaintiffs have stated no cause of action for breach of the covenant of good faith and fair dealing against INA in this case and their action must be dismissed. However, INA is entitled to adjudication of its claims against Juneau and Martin under the agreement of indemnity.

## II

### PLAINTIFFS' CROSS-APPEALS

In light of the foregoing conclusion that plaintiffs do not state a cause of action for bad faith against INA, any question concerning the trial court's ruling on the statute of limitations applicable to the cause of action is moot. Accordingly, we do not discuss that issue.

### DISPOSITION

The judgment is reversed with directions to dismiss plaintiffs' cause of action against INA and to conduct further proceedings with respect to INA's cross-complaint for indemnity. INA shall recover its costs on appeal.

Kremer, P. J., and Amos, J.,* concurred.

A petition for a rehearing was denied June 14, 1991, and the petitions of plaintiffs and appellants for review by the Supreme Court were denied August 22, 1991.

---

*Judge of the Municipal Court for the San Diego Judicial District sitting under assignment by the Chairperson of the Judicial Council.