[No. H012161. Sixth Dist. Jan. 30, 1995.]

AIRLINES REPORTING CORPORATION, Plaintiff and Appellant, v. UNITED STATES FIDELITY AND GUARANTY COMPANY, Defendant and Respondent.

COUNSEL

Irsfeld, Irsfeld & Younger and Ross R. Hart for Plaintiff and Appellant.

Ottenweller, Solan & Park and Arthur A. Park Defendant and Respondent.

OPINION

ELIA, J.—In this appeal we consider the scope of a surety bond issued by respondent United States Fidelity and Guaranty Company (USF & G) for the benefit of its obligee, appellant Airlines Reporting Corporation (ARC). The surety bond covered the default of the principal, a travel agency, when the agency failed to pay for airline tickets issued according to an agreement between ARC and the agency. On appeal, ARC contends that USF & G was obligated under the bond to cover the agency's default in payment for all tickets issued and used, whether as a result of a sale or, as here, a theft by a third party. We disagree with ARC's interpretation and affirm the judgment.

BACKGROUND

ARC is an organization authorized by various member airlines to issue blank airline ticket forms to travel agents and to collect money owed the airlines for tickets issued to the public. In order to participate in this program, known as the "Area Settlement Plan," a travel agent must be on ARC's approved list. Once approved, the agent receives blank ticket stock and identification plates for the member airlines, which are used to validate tickets. Each agent must execute the agent reporting agreement (ARA), which specifies the procedures for reporting and paying for tickets issued to the public. Every week the agent must report all transactions to a designated bank, which deducts from the agent's account the money due the ticketing carrier.

One of the conditions of accreditation by ARC is the agent's procurement of a performance bond, which ensures payment to the airlines if the agent fails to pay for the tickets it has issued. The agent may obtain a bank's irrevocable letter of credit as an alternative to the bond.

Between 1983 and 1990, Elite Travel, Inc. (Elite) was an accredited travel agency participating in the area settlement plan. Elite was first approved in 1983 by ARC's predecessor, the Air Traffic Conference of America (ATCA), and its agreement with ATCA was known as the "ATC Passenger

Sales Agency Agreement." Pursuant to the agreement, Elite procured a bond from USF & G in the amount of $10,000. The bond was conditioned upon Elite's performance of its obligations "with respect to remittances," as provided in the ATC Passenger Sales Agency Agreement. Subsequent riders increased the bond amount to $54,200, changed the obligee from ATCA to ARC, and expressly included the ARA within the meaning of the term "ATC Passenger Sales Agency Agreement" as the underlying contract between principal and obligee.

In June 1989 Elite terminated one of its accounting employees, Mario Goes. In early 1990 Elite learned that Goes had stolen blank ticket stock, validated them with identification plates from Elite's safe, and then either used them for travel or redeemed them for cash. When the affected airlines did not receive payment from Elite through the weekly sales report, they submitted "debit memos" reflecting the unpaid and unreported amounts. The airlines' claims eventually totaled $64,754.15.

In April 1990, Elite voluntarily deleted itself from the ARC's approved agency list. Shortly thereafter, it ceased doing business, largely because of Goes's theft. In August 1990 Elite's president, Brian MacLennan, advised ARC that Elite was unable to pay the airlines' claims.

In February 1991, ARC requested payment from USF & G of $54,200, the full amount of the bond. After learning that the tickets had been stolen, USF & G denied ARC's claim, stating that its obligation was confined to Elite's failure to comply with "the remittance procedure for the sale of travel documents."

ARC filed suit in December 1991. After receiving documentary evidence and oral testimony, the trial court found in favor of USF & G. This appeal followed.

## DISCUSSION

ARC's appeal focuses on a single question, the scope of USF & G's duty to ARC under the surety bond. ■ A surety bond is to be construed according to the same rules as those used in other contracts, with a view to ascertaining the intent of the parties. (Civ. Code, § 2837; *Bloom* v. *Bender* (1957) 48 Cal.2d 793, 803 [313 P.2d 568]; *Granite Construction Co.* v. *American Motorists Ins. Co.* (1994) 29 Cal.App.4th 658, 669 [34 Cal.Rptr.2d 835].) As the reviewing court, we engage in this construction de novo. (*Home Federal Savings & Loan Assn.* v. *Ramos* (1991) 229 Cal.App.3d 1609, 1613 [284 Cal.Rptr. 1].)

The document at issue here contained the standard language of a performance bond. Naming Elite as principal and ATCA (ARC's predecessor) as obligee, it provided the following: "AND WHEREAS, the Sales Agency Agreement [later, the ARA] provides, in part, that the Principal shall *remit on a weekly basis for transportation sold* (in accordance with said Agreement), or at such intervals as the Obligee may designate . . . and further, that the Principal shall be entitled to deduct from such remittances the applicable commissions, as specified in said Agreement. [¶] Now, THEREFORE, THE CONDITION OF THIS OBLIGATION IS SUCH that if the Principal shall duly comply with the provisions of said Sales Agency Agreement with respect to remittances to the Obligee, as in said Agreement provided, then this obligation to be void, otherwise to remain in full force and effect in law . . . ." (Italics added.)

Standing alone, this document appears to contemplate coverage in the event that Elite, as principal, fails to comply with the provisions of the ARA governing remittance "for transportation *sold.*" The bond must, however, be read in conjunction with the ARA, which is expressly incorporated by reference. (Cf. *Boys Club of San Fernando Valley, Inc.* v. *Fidelity & Deposit Co.* (1992) 6 Cal.App.4th 1266, 1271-1272 [8 Cal.Rptr.2d 587].)

The ARA describes its purpose as "to facilitate the issuance of ARC traffic documents . . . to the public by agents of carriers in a competitive and efficient manner." The agreement by its terms sets forth the conditions under which the agent "is authorized to issue ARC traffic documents." It expresses the parties' intent that the agent "will utilize the [Area Settlement] Plan to report ARC traffic documents issued for the *sales* of air transportation and ancillary services on behalf of the carriers appointing such Agent, and make settlement therefor." (Italics added.)

The ARA also relates the bond requirement to the duty to report and remit the proceeds of ticket transactions. Section IV(A) of the ARA states that the bond "shall be conditioned upon the Agent's compliance with the provisions of this agreement governing remittances to ARC for the carriers. Subject to the minimum and maximum amounts stated below, the amount of the bond shall be equal to at least the *average monthly net cash remittance* as determined for the twelve-month period ending on the last sales period ending date of the fifth month prior to the anniversary date of the Agent's bond." (Italics added.) The "net cash remittance" is the amount of the total sale, less the agent's commission.

If an irrevocable letter of credit is substituted for the bond, the amount is determined "at all times in the same manner as the amount of the bond." In

order to invoke the letter of credit, ARC must submit a letter to the issuing bank stating the following: " 'Claims have been submitted or may be submitted to ARC by carriers for ARC travel documents issued by the referenced travel agency for *gross sales, less earned commissions*, which remain or may remain unpaid by the travel agency, and the funds represented by the attached draft(s) are required for the protection of ARC and the carriers." (Italics added.) Lloyd South, manager of financial recovery at ARC, testified that there could not be a loss covered under a bond that would not be compensable under a letter of credit.

 It thus appears from the language of the ARA that the bond requirement was intended to protect airline carriers from losses incurred as a result of an agent's failure to pay for tickets issued according to the procedures approved by the ARC. The amount of the bond or letter of credit is specifically tied to the agent's sales history.[1] Although there are extensive concomitant rules describing security measures agents must take to prevent theft of ticket stock and validation plates, these provisions are independent of the primary responsibility of the agent to report and pay for transactions conducted in the normal course of business. It is that responsibility that is the subject of the bond or letter of credit.

ARC protests that interpreting the surety's obligation to include only legitimate ticket sales is overly restrictive and "places form over substance." Instead, it argues, the bond encompasses *all* "remittance obligations"—that is, payment for "*all traffic documents issued and validated* whether or not a 'sale' was involved." According to ARC, stolen tickets are no different from those issued as a gift; they are merely different kinds of "transactions" involving tickets "issued and used." In *any* transaction involving the issuance and use of tickets—whether by a legitimate sale, gift, legitimate or fraudulent use by an agent, or theft by a third party—the agent must nonetheless remit the proceeds to the carrier. The surety likewise may not be relieved of its obligation to cover the default of the agent merely because the nature of the transaction did not involve a sale.

The premise of this argument—that "issued and validated" documents include stolen ones—is unsound. We agree that transactions involving the issuance of tickets can take many forms besides sales to the public; as ARC points out, the agent would still be obligated to pay for a ticket issued as a gift to his or her uncle. Theft by a third party, however, even by a former employee, cannot reasonably be viewed as a "transaction" involving "issuance" of the merchandise. The relevant question is not whether the obligations of principal and surety cover issuance of tickets through nonsale

---

[1]The ATC Passenger Sales Agency Agreement, the precursor to the ARA, similarly provided for a bond based on "gross cash sales of air transportation."

transactions, but, more simply, whether the bond was intended to cover the agent's remittance for used tickets that, under authorized procedures, were never issued at all.

It is settled that a surety is not liable for anything that extends beyond the letter of its contract. (*Heidt* v. *Minor* (1891) 89 Cal. 115, 118 [26 P. 627]; *Brock* v. *Fidelity & Deposit Co.* (1938) 10 Cal.2d 512, 518 [75 P.2d 605]; *Schmitt* v. *Insurance Co. of North America* (1991) 230 Cal.App.3d 245, 258 [281 Cal.Rptr. 261].) The surety's obligation is strictly construed so as not to impose a burden not contained in or clearly inferable from the language of the contract. (*Sather Banking Co.* v. *Briggs Co.* (1903) 138 Cal. 724, 730 [72 P. 352]; *City of L.A.* v. *Hoppenyan's Inc.* (1935) 8 Cal.App.2d 138, 141 [47 P.2d 293].)

The broad construction ARC urges would convert the document at issue into a liability insurance policy. The two kinds of contracts, however, are conceptually and legally distinct. (See generally, Conners, California Surety & Fidelity Bond Practice (1969) §§ 1.3-1.5.) An insurer undertakes to indemnify another "against loss, damage, or liability arising from an unknown or contingent event," whereas a surety promises to "answer for the debt, default, or miscarriage of another." (*Meyer* v. *Building & Realty Service Co.* (1935) 209 Ind. 125 [196 N.E. 250, 253-254, 100 A.L.R. 1442].) The surety relationship is a tripartite one; it is a third party (the obligee), not the principal, who is protected, although the principal pays the premium. Furthermore, an insurer has no right of subrogation against its insured; a surety, on the other hand, is entitled to reimbursement by its principal. (*Am. Inter-Fidelity Exchange* v. *Am. Re-Insurance* (7th Cir. 1994) 17 F.3d 1018, 1022.) The differences in these two kinds of contractual relationships are reflected in the manner in which premiums are calculated: "[U]nlike insurers, sureties do not pool premiums to spread risk; instead, the surety premium is based on individual contract factors such as the size of the underlying contract, the financial stability of the principal, and the likelihood of default." (Udelman, *Surety Contractors: Are Sureties Becoming General Liability Insurers?* (1990) 22 Ariz. St. L.J. 469, 478, fns. omitted.)

USF & G did not promise to insure Elite against liability for failing to safeguard the documents from theft; nor did it promise to indemnify Elite or ARC against such claims.[2] Instead, it assured ARC of payment in the event that Elite failed to perform its duty to remit the proceeds due the

---

[2] A surety bond is not a contract of indemnity. " 'The essential distinction between an indemnity contract and a contract of guaranty or suretyship is that the promisor in any indemnity contract undertakes to protect his promisee against loss or damage through a

airlines from "transportation sold" to the public. Accordingly, we agree with the trial court's construction of the surety contract to preclude recovery by ARC in this instance.[3]

## DISPOSITION

The judgment is affirmed.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.

---

liability on the part of the latter to a third person, while the undertaking of a guarantor or surety is to protect the promisee against loss or damage through the failure of a third person to carry out his obligations to the promisee.' [Citation.]" (*Somers* v. *United States F. & G. Co.* (1923) 191 Cal. 542, 547 [217 P. 746]; *Leatherby Ins. Co.* v. *City of Tustin* (1977) 76 Cal.App.3d 678, 687 [143 Cal.Rptr. 153].) The undertaking in a contract of indemnity against loss is not to answer for the debt, default or misconduct of another, but to make good the loss resulting to the indemnitee from that debt, default or misconduct. (*Rashid* v. *Schenck Const. Co., Inc.* (1993) 190 W.Va. 363 [438 S.E.2d 543, 548].) Thus, "the concept of indemnity assumes that the party to be indemnified is somehow liable or obligated to another." (*Leatherby Ins. Co.* v. *City of Tustin, supra,* 76 Cal.App.3d at p. 687.)

 [3]This litigation might have been prevented if the parties had eschewed the pro forma recitations of the standard performance bond and instead described the surety's obligation in more specific terms. A surety who wishes to make it clear that it does not protect the obligee against a particular event (such as theft) should ensure that this exception is explicitly set forth in the bond.