Filed 10/22/13

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

NISSHO OF CALIFORNIA, INC.,

    Plaintiff and Appellant,

v.

BOND SAFEGUARD INSURANCE COMPANY,

    Defendant and Appellant.

E052746

(Super.Ct.No. INC075909)

OPINION

APPEAL from the Superior Court of Riverside County. Thomas A. Peterson (retired judge of the L.A. Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.) and John G. Evans, Judges. Reversed in part, affirmed in part.

Mordy Law Offices and Christopher R. Mordy for Plaintiff and Appellant.

Voss, Cook & Thel, Francis T. Donohue III, Jessica T. Elmassian; Harris Beach and Bruce L. Maas for Defendant and Appellant.

Robins, Kaplan, Miller & Ciresi, David C. Veis and Laura P. Nash for The Surety & Fidelity Association of America as Amicus Curiae on behalf of Defendant and Appellant.

1

Prior to entering into a Subdivision Improvement Agreement (SIA) with the City of Palm Springs (City) for the development of a private residential community called the Avalon Palm Springs Village project (Avalon), Suncal PSV, LLC (Suncal), the owner of the property in a joint venture partnership with Lehman Brothers, obtained a Maintenance and Warranty Bond, several faithful performance (FP) bonds, and seven labor and materials (L&M) bonds from defendant and appellant Bond Safeguard Insurance Company (Safeguard) to insure the project. Suncal and City then entered into a SIA which specifically required landscaping improvements to "offsite" areas bordering the project, which were owned by City.[1] City required the landscaping for the "offsite" areas be bonded. Suncal had previously obtained a L&M bond for "Off-Site Landscaping & Traffic" in the amount of $566,200, representing 50 percent of the estimated cost of those improvements.

Suncal entered into three separate contracts with plaintiff and appellant Nissho of California, Inc. (Nissho) for the landscaping of Avalon. One of those contracts, for $1,639,777.19, covered labor and materials for the "offsite" landscaping required in the SIA. Nissho completed a substantial portion of the work in the offsite contract but never received payment. On January 4, 2008, Nissho gave notice to Suncal and Safeguard that it had not been paid the sum of $896,963.53 for work performed on the offsite

---

[1] "Off-site improvements refer to improvements that are off of the property site itself," i.e., "off-site landscaping refers to landscaping off the private property, for example on adjacent public property."

landscaping contract. Attached to the letter were copies of both the FP and L&M "Off-Site Landscape & Traffic" bonds and the Maintenance and Warranty bond.

Nissho filed suit against both Suncal and Safeguard seeking damages of $1,597,567.82 as against Suncal for breach of all three contracts and $909,986.96 as against Safeguard on the L&M bonds.[2] After a bench trial, the court ruled in favor of Nissho in the amount of $1,041,148.55, permitting it to seek recompense against all the L&M bonds, regardless of their characterization. Nissho filed a motion for attorney fees, which the trial court denied. Safeguard appeals contending the trial court erred in awarding Nissho damages in excess of the L&M bond for "Off-Site Landscaping & Traffic" (the "Offsite Bond"). Nissho appeals maintaining it was entitled to an award of attorney fees. We reverse the judgment with respect to the trial court's award of damages to Nissho above the limit of the Offsite Bond. We affirm the judgment with respect to the trial court's denial of Nissho's motion for attorney fees.

## FACTUAL AND PROCEDURAL HISTORY

Director of Public Works and City Engineer David Barakian, testified it was City's responsibility to make sure any proposed development was consistent with City's general plan as adopted by the city council. Barakian reviewed all plans for new developments in the city and had authority to accept or reject any proposed plans. If a

---

[2] At trial, Nissho also attempted to obtain remuneration against the L&M bonds for on-site work it had completed but for which it had not been paid. Suncal apparently filed for bankruptcy to which Nissho would, by all accounts, have been entitled to become a claimant. Additionally, Nissho's counsel conceded that as a licensed contractor, Nissho had resort to recover under a mechanic's lien on the work it performed on "on-site" areas.

3

developer was proposing a new development within the city, it was required to obtain security to pay for the improvements in case they were not completed by the developer; in this instance, the security consisted of bonds. The form of the bond was dictated or approved by the city attorney.

Developers were required to obtain bonds for both FP and L&M. FP bonds ensured that if the developer refused or was unable to complete the project City could recover the costs for the improvements it deemed necessary. L&M bonds "cover the costs of labor and materials of vendors and subcontractors employed by the developer in performance" of the contract. A Maintenance and Warranty bond covered improvements for a one-year period after the city accepted the improvements. Suncal asked City if it could break up the securities by category of the work to be performed.

Between October 27, and 30, 2006, Suncal obtained from Safeguard FP bonds totaling $17,385,000 or 100 percent of the estimated cost for the proposed works of improvement. On the same dates, Suncal obtained from Safeguard seven L&M bonds totaling $8,692,500, or 50 percent of the estimated construction costs. The L&M bonds were enumerated and valued as follows: (1) Domestic Water $1,635.452; (2) Storm Drain $244,250; (3) Sanitary Sewer System $1,566,350; (4) AC Pavement $2,035,000; (5) Aggregate Base $892,675; (6) Curb & Gutter/Flatwork $1,762.575; and (7) Offsite Landscaping & Traffic $566,200. Suncal additionally acquired a Maintenance and Warranty of Improvements bond in the amount of $169,860. The offsite landscaping

4

improvements were proposed by Suncal in order that the surrounding public areas would match the on-site landscaping of the development.[3]

Todd Rohm, an independent insurance agent working for Rohm Insurance Agency signed the Offsite Bond as attorney-in-fact for Safeguard. It was on a city bond form. Rohm testified separate bonds, rather than a single bond, were issued because it would narrow the scope of the work performed allowing the principal, Suncal, to obtain releases from City under the individual bonds so that it would not continue to be liable for the total amount of improvements yet to be constructed. Thus, if the curbs and gutters, landscaping, and streets were completed, Suncal could be released by City for liability for the completed works while remaining liable only for those yet to be completed. The SIA was entered into by the parties on December 18, 2006. Rohm testified "It's very typical that the bonds have to be prepared and included within the agreements and submitted all at one time and then the—the agreement is often times signed at a later date when everything is provided, security included, the bond security."

Moreover, renewal premiums were required to be paid on all the bonds, so it would be less costly for a developer to have separate bonds, some of which might be completed and released, than it is to have one large bond that must continue to be renewed until the entire project is completed. Once the work secured by a particular bond is signed off and accepted by the city, the bond is exonerated and the principal no

---

[3] Suncal "wanted to . . . take the landscaping . . . that had been there for years, and to change it at their expense, to have new landscaping put in in that area that better fit the type of landscaping they were putting in elsewhere . . . ."

5

longer is required to pay premiums on that bond. Furthermore, if a claim is made on a single L&M bond, the claimant could obtain an award for the entire amount of the bond to the exclusion of all other subcontractors, laborers, or suppliers who could potentially also make claims against the same bond; thus, bonds separately designated for divergent areas of work would make it more likely that any particular subcontractor could obtain recompense against the bond if the developer became unable to pay.

Each category of bond issued covered only work performed within the purview of that bond. Construction estimates were created to enumerate what work would be covered by each particular bond. Those estimates determined what entities could recover for any particular type of work designated under the separately characterized bonds. Any work not performed on those worksheets would not be covered by that bond. Carol Templeton, an Engineering Associate for City who was involved in the SIA and the bond calculations for Avalon, testified the bond amounts were assessed using the amounts in the bond worksheets. She obtained the amount for the Offsite Bond by obtaining estimates from two subcontractors for the total amount of the work required; the amounts were doubled to provide a "cushion" in case City had to perform the work itself. There was no requirement that Suncal's contractors or subcontractors pay prevailing wages for any of the project's work, including the offsite landscaping.

Marcus Fuller, the Assistant Director of Public Works and Assistant City Engineer for City who prepared and reviewed all the bonds in the Avalon project, testified none of the landscape improvements were ever accepted by City. He testified it is unusual for City to require landscaping bonds for such projects; City only required landscaping bonds

6

in the Avalon project for offsite areas that City would later be required to maintain. City did not require that landscaping in on-site areas, areas which would be within the community and not on City land, be bonded. Nonetheless, even though the bonds covered offsite areas belonging to City, the bonds were "not bonds associated with public work projects."

Nabu Kato, the owner and founder of Nissho, testified he provided estimates to Suncal for the landscaping work on Avalon. His estimates did not include prevailing wages. Nissho subsequently signed contracts with Suncal for the landscaping work. Kato defined offsite work as any work conducted on land that would eventually be turned over either to the homeowners' association or City.

After trial, the parties agreed the primary dispute between Nissho and Safeguard was not whether Nissho could and should recover money from one of the bonds, but which bond or bonds and up to what amount. Safeguard contended Nissho was limited to recovering the $566,200 for work under the Offsite Bond. In fact, Safeguard conceded Nissho's work was "covered by the [Offsite Bond]"; Nissho "did landscape work[,] [t]hey're entitled to recover under that bond up to $566,000"; it simply contested Nissho's ability to reach the other L&M bonds. Nissho argued it could recover for all its work, both offsite and on-site, under all the L&M bonds.

The court entered judgment in favor of Nissho in the amount of $1,041,148.55 plus costs and interest from January 2008. The court found Nissho had provided work in the amount of $1,041,148.55. The court further found, "The SIA only requires that a security instrument (singular) be provided for L&M. Therefore, SunCal and Safeguard

7

contracted to split the L&M requirement into seven separate bonds. No subcontractor was a party to this agreement. Thereby, Safeguard contracted with Suncal to limit it[]s own liability to the detriment of the subcontractors." Thus, "The court finds that Safeguard is liable to Nissho up to an amount not exceeding $8.6 million." The court additionally awarded Nissho recovery of interest dating back to the date of its claim because the court found Nissho was not limited to the amount of the L&M landscape bond. Finally, the court tentatively found Nissho was not entitled to recover attorney fees because insufficient evidence established the L&M bonds were public works payment bonds. Thus, the fact that some of the areas would come under the control of City did not alter the private nature of the agreement at the time it was signed.

Nissho later filed a motion for attorney fees as a direct obligee of the bond. The court denied the motion, expositing, "[Nissho] as the prevailing party is not entitled to attorneys fees under the Labor and Materials Bonds [Government Code section] 66499.2 or Civ[il] Code [sections] 3082 et seq. The purpose of the Labor and Material Bonds involved here is to protect . . . City . . . by providing for payment to the contractors subcontractors[,] laborers[,] materialmen[,] and all other persons employed in the performance of the work of improvement[,] for materials furnished or labor thereon of any kind. The bonds are not designed to establish a fund for payment of breach of contract damages beyond the reasonable amount of materials or labor provided. Even if the contract between Suncal . . . and Nissho . . . provided for attorneys fees to the prevailing party the court would reach the same decision."

## DISCUSSION

### A.    INTRODUCTION

"'The Subdivision Map Act is "the primary regulatory control" governing the subdivision of real property in California.' [Citation.]  It has three principal goals:  'to encourage orderly community development, to prevent undue burdens on the public, and to protect individual real estate buyers.' [Citation.]  It 'seeks "to encourage and facilitate orderly community development, coordinate planning with the community pattern established by local authorities, and assure proper improvements are made, so that the area does not become an undue burden on the taxpayer."' [Citation.]" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 798-799.)

"To accomplish its goals, the Subdivision Map Act sets suitability, design, improvement, and procedural requirements (e.g., Gov. Code, §§ 66473 et seq., 66478.1 et seq.).  It also allows local governments to impose supplemental requirements of the same kind (e.g., *id.*, §§ 66475 et seq., 66479 et. seq.).  [Citation.]  Further, '[t]he Act vests the "[r]egulation and control of the design and improvement of subdivisions" in the legislative bodies of local agencies, which must promulgate ordinances on the subject.' [Citation.]  The local entity's enforcement power is directly tied to its power to grant or withhold approval of a subdivision map.  Thus, '[o]rdinarily, subdivision under the Act may be lawfully accomplished only by obtaining local approval and recordation of a tentative and final map . . . .' [Citation.]" (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles*, *supra*, 55 Cal.4th at p. 799.)

"By the enactment of this article, the Legislature intends to accomplish . . . the following objective[]:  [¶] . . . [¶]  (c) To ensure that local agencies have maximum discretion . . . in the imposition of conditions on any approvals occurring subsequent to the approval or conditional approval of the vesting tentative map . . . ."  (Gov. Code, § 66498.9)[4]  Whenever the furnishing of security is required it shall be in any form of security which is acceptable to the local agency including one or more bonds by one or more authorized corporate sureties.  (§ 66499, subd. (a)(1)(5).)

"A surety is 'one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor.'  [Citation.]  A surety bond is a '"written instrument executed by the principal and surety in which the surety agrees to answer for the debt, default, or miscarriage of the principal."'  [Citation.]  In suretyship, the risk of loss remains with the principal, while the surety merely lends its credit so as to guarantee payment or performance in the event that the principal defaults.  [Citation.]  In the absence of default, the surety has no obligation.  [Citation.]"  (*Cates Construction, Inc. v. Talbot Partners* (1999) 21 Cal.4th 28, 38.)

"'[A] surety on an official bond undertakes no liability for anything which is not within the letter of his contract.  The obligation is *strictissimi juris*; that is, he has consented to be bound only within the express terms of his contract and his liability must be found within that contract or not at all.  [Citation.]  "Where a surety bond is given pursuant to the requirements of a particular statute, the statutory provisions are

---

[4]  All further statutory references are to the Government Code unless indicated.

10

incorporated into the bond." [Citation.]' [Citation.]" (*Schmitt v. Insurance Co. of North America* (1991) 230 Cal.App.3d 245, 258.) "The surety's obligation is strictly construed so as not to impose a burden not contained in or clearly inferable from the language of the contract. [Citations.]" (*Airlines Reporting Corp. v. United States Fidelity & Guaranty Co.* (1995) 31 Cal.App.4th 1458, 1464.)

"'In general, a surety bond is interpreted by the same rules as other contracts. That is, we seek to discover the intent of the parties, primarily by examining the words the parties have chosen giving effect to the ordinary meaning of those words.'" (*Amwest Sur. Ins. Co. v. Patriot Homes, Inc.* (2005) 135 Cal.App.4th 82, 86-87.) "[I]f the trial court's interpretation [was] based solely on an examination of the contract, the interpretation of the contract is a question of law and this court will independently review the validity of the trial court's construction. [Citation.] However, if the trial court [was] presented with conflicting extrinsic evidence to aid in the interpretation of the contract, 'a reasonable construction of the agreement by the trial court which is supported by substantial evidence will be upheld. [Citations.]' [Citations.]" (*Lugosi v. Universal Pictures* (1979) 25 Cal.3d 813, 852.)

"It long has been settled in California that where a bond incorporates another contract by an express reference thereto, 'the bond and the contract should be read together and construed fairly and reasonably as a whole according to the intention of the parties.' [Citations.] To ascertain the nature and extent of the liability to which the surety has bound itself, courts must 'examine the language of the undertaking by the light of the [construction] agreement, faithful performance of the terms of which it

11

guarantees.' [Citations.] As a general rule, '[t]he obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal . . . .' [Citation.]" (*Cates Construction, Inc. v. Talbot Partners*, *supra*, 21 Cal.4th at pp. 39-40.) Here, the parties agree that although there was no express reference to the L&M bonds in the SIA, the parties intended the SIA to incorporate the L&M bonds.

B.     NISSHO WAS LIMITED TO RECOVERING AGAINST THE PENAL SUM ENUMERATED IN THE OFFSITE BOND IN THE AMOUNT OF $566,200

Safeguard contends Nissho was limited to recovering against the amount enumerated in the Offsite Bond. We agree.

Here, the court resorted to the consideration of evidence extrinsic to the SIA and the bond agreements. As such, we may consider such evidence in determining whether its interpretation of the SIA was supported by substantial evidence. Considering the uncontradicted parole evidence of the SIA adduced below, we hold Nissho was limited to recover only in an amount no greater than the penal sum specified in the Offsite Bond.

First, section 66499 et seq. clearly provide for the legality of obtaining separate bonds to furnish security for projects such as the SIA. Section 66499, subdivision (a)(1) allows for a "[b]ond or bonds by one or more duly authorized corporate sureties." Section 66499.2, which dictates the form of any L&M bond issued under the statutes, provides "A bond or bonds by one or more duly authorized corporate sureties for the security of laborers and material suppliers shall be in substantially the following form[.]"

12

Thus, the issuance of multiple L&M bonds for a development project was clearly envisioned under the statutory scheme.

Second, it is notable all the Avalon security bonds were issued more than a month *prior* to the execution of the SIA. All the bonds were issued between October 27, and 30, 2006. The SIA was not signed until December 6, 2006, at which time City had already accepted Nissho's provision of security, which the parties agree was incorporated into the SIA. Thus, the parties to the SIA clearly intended the provision of multiple L&M bonds to be acceptable.

The evidence adduced below established City consented to the issuance of separate securities characterized by the work to be performed. City was approached prior to issuance of the securities with a request that City permit Suncal to obtain separate securities. City was intimately involved in determining the amounts of the bonds through the use of bond worksheets and contractor estimates specifically delineated by the type of work to be performed; thus, not only was City aware that separate bonds would issue, it aided Suncal in determining their scope. The security bonds were on forms supplied and approved by City. City reviewed the adequacy of the bonds prior to entering into the SIA. Thus, City exercised its statutorily invested "maximum discretion" in approving the SIA with separate security bonds. (§ 66498.9, subd. (c).)

Third, contrary to the court's ruling, it was undisputed below that Suncal, *not Safeguard*, requested issuance of separate securities. Thus, contrary to the court's characterization, Safeguard did not attempt "to limit it[]s own liability to the detriment of the subcontractors." Indeed, Safeguard did only what was requested of it: issue separate

13

securities in amounts and characterizations of the work to be performed as designated by Suncal and City. Since, as discussed *ante*, the bonds were on City forms and in amounts determined by City and Suncal based on subcontractor estimates, it is difficult to assign nefarious intent to Safeguard for doing exactly what was asked of it.

Fourth, it is entirely consistent with a reading of the SIA that Suncal would have Safeguard issue separately denominated L&M bonds limited to the work therein described. Nissho maintains the SIA's provision that, "A Security Instrument guaranteeing the payment to contractors, subcontractors, and other persons furnishing labor, materials, and/or equipment ('Labor and Materials Security Instrument') with respect to the Works of Improvement in an amount equal to $8,692,500 equal to 50% of the estimated construction cost," required Safeguard to issue *one* L&M bond in the amount of 50 percent of all estimated construction costs, from all of which it was entitled to seek remuneration. Likewise, Nissho argues language in each of the L&M bonds reading, "for materials furnished or labor thereon *of any kind*" allowed it to disregard the characterization of each bond since it provided work that would fall within the broad definition "of any kind." (Italics added.) The clear intent of those provisions was to provide adequate security for the entire project in the SIA and the categories of improvements denominated in the separate L&M bonds. The fact that Suncal had Safeguard issue separate bonds securing disparate facets of the project comes well within that intent. (*Lunardi v. Great-West Life Assurance Co.* (1995) 37 Cal.App.4th 807, 820.)

14

Whether Suncal obtained one security instrument or several, the bonds obtained by Suncal from Safeguard covered the amounts and work required by the SIA, City, and Government Code sections 66499 et seq. (Civ. Code § 1650; *County of Kern v. California Dept. of Health Services* (2009) 180 Cal.App.4th 1504, 1513-1514.) City chose to limit the L&M bonds to 50 percent of the estimated costs of the improvements to be performed by the contractors, subcontractors, laborers, materialmen, and suppliers.

The Offsite Bond in the amount of $566,200 represented 50 percent of all estimated offsite landscaping *and traffic improvements*. The amount of the bond was determined primarily from cost estimates provided by Nissho itself. Moreover, the estimates that provided the base amount for the Offsite Bond were doubled to provide a "cushion" in case City had to perform the work. This is, presumably, because once City had to undertake the work, it would become a public works project requiring City to pay prevailing wages. Thus, because the Offsite Bond included amounts for non-landscape work and doubled the construction estimates for all work performed under its aegis, the bond could not be construed as limiting any subcontractor's potential recovery under the bond in the event Suncal defaulted, particularly Nissho, which participated in the computation of the bond's amount. Indeed, because Nissho's offsite landscaping contract with Suncal amounted to $1,639,777.19, Nissho was at least on constructive notice that its contract amount twice exceeded the Offsite Bond and, therefore, it would be unable to recover even half the value of its work from the bond should Suncal default.

15

Fifth, Nissho presumably had knowledge of both the SIA and the bonds before it bid on or accepted award of the offsite landscaping contract with Suncal. As noted *ante*, Nissho had provided construction estimates, which served as the basis for the amount of the Offsite Bond. The incorporated bonds and bond worksheets were attached to the SIA, which was recorded in the county recorder's office. Kato testified Nissho began landscaping in 1984. Over its ensuing 20-plus-year history, Nissho expanded to the point where it had four regional offices operating in Chula Vista, Temecula, Palm Springs, and Vista, California. Nissho specialized in multiple large projects of up to 800,000 acres with 14,000 home sites.

Under these circumstances, it is reasonable to conclude Nissho knew that under section 66499.3, subdivision (b), City was able to require that Suncal provide L&M bonds limiting Nissho's recovery in the event of Suncal's default to only 50 percent of the work it completed or 50 percent of the total work conducted on the project. Thus, Nissho was effectively on notice it could not rely on the entirety of all the L&M bonds for recovery in the event of Suncal's default. Nissho complains, "The net effect of . . . Safeguard's [bond] headers, if they are enforceable, is that contractors such as [Nissho] cannot be paid the full value of their work and labor." Section 66499.3, subdivision (b) permits City to limit recovery for subcontractors to 50 percent of the work provided. City elected to require only the minimum amount of coverage required by statute.

Sixth, the court's judgment did not differentiate between Nissho's on-site and offsite work. On the contrary, the court's judgment aggregated the three separate contracts Nissho entered into with Suncal and noted Nissho had performed $1,041,148.55

16

worth of work on the aggregated contracts, the exact amount it awarded Nissho. Thus, the court erroneously permitted Nissho to recover against the bonds for its on-site work. Although Nissho sought recovery against the bonds for both its on-site and offsite work, the undisputed testimony below established that only its offsite work was covered by the Offsite Bond. Thus, only offsite landscaping was bonded and the court's award of recovery against the bonds for on-site work performed by Nissho was error.

Seventh and finally, treatment of all the L&M bonds as one singular bond while disregarding each bond's limitations with regard to the type of work characterized therein would ignore the intent of the actual parties to the bonds and the legal requirement that bonds be strictly construed to limit the surety's obligations to those expressly specified. Here, Safeguard was presented with bonds by Suncal on City forms, in language written by City, based upon language required by statute, in amounts based upon estimates provided by subcontractors, and with characterizations of the work to be performed provided by City and Suncal. Safeguard issued the bonds as they were presented to it. Nissho invokes former Civil Code section 3226 providing, "Any bond given pursuant to the provisions of this title will be construed most strongly against the surety and in favor of all persons for whose benefit such bond is given . . . ." Assuming arguendo the bonds issued in this case were "given pursuant to the provisions of" that title, we still fail to see how they could be interpreted to allow Nissho, a landscaper, to recover against bonds specifically limited to work on domestic water, storm drains, sanitary sewer system, AC pavement, aggregate base, and/or curb and gutter/flatwork. Moreover, Nissho's argument below that "since . . . Safeguard had the opportunity to make any changes that

17

they felt were appropriate, then it has to be interpreted most strongly against them," is belied by the statutory requirements for the language contained in the bonds. Government Code section 66499.2 dictates the language of the bond and, as testified to at trial, the language of the bonds was on City forms approved by City; thus, Safeguard had no opportunity to make changes to the language of the bonds and construing it against the "drafter," here either City or the Legislature, would not inure to Nissho's benefit.

In conclusion, we hold in consequence of the uncontradicted parole evidence adduced below, insufficient evidence supported the trial court's interpretation of the SIA to require a single security instrument. Thus, Nissho was limited to recovering against the Offsite Bond in the amount of $566,200 for its offsite work only. We therefore reverse the court's judgment awarding Nissho $1,041,148.55 against all the L&M bonds. Since the trial court failed to distinguish amounts Nissho expended in its offsite and on-site work, the matter must be remanded for a determination of whether Nissho expended work valued up to or above the penal sum of $566,200 designated in the Offsite Bond. To the extent it did, judgment should be entered in Nissho's favor in the maximum amount of $566,200.

C.    NISSHO'S RECOVERY OF INTEREST

The trial court ruled Nissho would be allowed to recover interest dating back to the date of its initial claim because it was not limited to recovery against the penal sum of $566,200 designated in the Offsite Bond. Thus, because Nissho could seek recovery against all the L&M bonds with an aggregate value of $8,692,500, and Nissho had only recovered $1,041,148.55 against those bonds, sufficient additional bond funds were

18

available to permit Nissho to recoup interest. On appeal, Safeguard requests that, to the extent we hold Nissho was limited to recovering the penal sum of $566,200 designated in the Offsite Bond, we determine whether Nissho could recover interest above and beyond the sum specified in that bond.

In the first instance, we decline to make such a determination because we believe the question is not ripe for review. (*Vandermost v. Bowen* (2012) 53 Cal.4th 421, 461 ["'The ripeness requirement, a branch of the doctrine of justiciability, prevents courts from issuing purely advisory opinions. [Citation.] It is rooted in the fundamental concept that the proper role of the judiciary does not extend to the resolution of abstract differences of legal opinion'"].) The trial court did not make a determination of whether, if Nissho had recovered up to the amount limited by the bond, Nissho could recover additional funds for interest. Second, since the trial court made no determination of whether the value of Nissho's work performed on the offsite contract equaled or exceeded the limits of the Offsite Bond, that determination must be made before any determination on interest can be made. Thus, on remand we direct the trial court to determine both the amount Nissho may recover for offsite work performed against the limits of the Offsite Bond and, if it equals or exceeds that amount, whether Nissho can recover an additional amount for interest.

D.     ATTORNEY FEES

Nissho contends that as the prevailing party in the action below, it was statutorily entitled to an award of attorney fees. Safeguard maintains there was no statutory basis for awarding Nissho attorney fees and, therefore, the trial court's denial of Nissho's

19

motion for attorney fees was based on a correct interpretation of the statutory law. We agree with Safeguard.

"""On review of an award [or denial] of attorney fees after trial, the normal standard of review is abuse of discretion. However, de novo review of such a trial court order is warranted where the determination of whether the criteria for an award of attorney fees [has] been satisfied [pursuant] to statutory construction and a question of law."' [Citation.]" (*Heritage Pacific Financial, LLC v. Monroy* (2013) 215 Cal.App.4th 972, 1003.) The "American rule" requires that "unless expressly provided in contract or statute, each party to a litigation must pay its own attorney fees. [Citations]" (*Serpa v. California Surety Investigations, Inc.* (2013) 215 Cal.App.4th 695, 709.)

Section 66499.4 provides, "As a part of the obligation guaranteed by the security and in addition to the face amount of the security, there shall be included costs and reasonable expenses and fees, including reasonable attorneys' fees, incurred by the *local agency* in successfully enforcing the obligation secured." (Italics added.) Likewise, as mirrored in the bonds issued in this case, the language required by section 66499.2 provides, "that the surety will pay the same in an amount not exceeding the amount hereinabove set forth, and also in case suit is brought upon this bond, will pay, in addition to the face amount thereof, costs and reasonable expenses and fees, including reasonable attorney's fees, incurred by county (or city) in successfully enforcing this obligation, to be awarded and fixed by the court, and to be taxed as costs and to be included in the judgment therein rendered." Since, Nissho is not a local agency or municipality, it

20

cannot recover attorney fees according to the Subdivision Map Act pursuant to which the bonds and SIA were executed in the instant case.

Nonetheless, Nissho argues it is entitled to an award of attorney fees pursuant to former Civil Code section 3250, which provided, "An action on the payment bond may be maintained separately from and without the filing of an action against the public entity by whom the contract was awarded or any officer thereof.  In any action, the court shall award to the prevailing party a reasonable attorney's fee, to be taxed as costs."  (Since renumbered Civ. Code, § 9564 [eff. July 1, 2012].)  Former Civil Code section 3250 was part of former Title 15 which required a payment bond when a contractor was "awarded a contract by a public entity."  (Former Civ. Code, § 3247, subd. (a))  "'Public work' means any work of improvement contracted for by a public entity."  (Former Civ. Code, § 3100.)

A "'Public entity' means the state, Regents of the University of California, a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the state."  (Former Civ. Code, § 3099.)  Public works projects require a bond in an amount "not less than one hundred percent of the total amount payable by the terms of the contract."  (Former Civ. Code, § 3248, subd. (a).)

We agree with the trial court's tentative determination that "the evidence is insufficient to establish that these were public works payment bonds.  The fact that the outer perimeter (the landscaping) of the subdivision may some day [*sic*] come under the management of . . . City . . . as to maintenance, cannot alter the status existing at the time the agreement was signed.  There appears to be no other basis for awarding attorney

21

fees." Indeed, Fuller testified the bonds issued in the Avalon project were, "not bonds associated with public work projects." Public works projects would have required the payment of prevailing wages. It was Suncal, not City's, determination to landscape the offsite areas so they would match the landscaping of the on-site areas. City did not require payment of prevailing wages on the offsite landscape work. However, the amounts calculated from contractor estimates were doubled for purposes of specifying the amount of the bonds in case the City ended up contracting for the work itself upon Suncal's default. Only in such circumstances where City itself was directly contracting for the work would it have become a public works project requiring the payment of prevailing wages. Thus, Nissho was not entitled to recover attorney fees under former Civil Code section 3250 because it was not engaged in a public works project.

Nissho exposits two cases in support of its proposition that its offsite work qualified as public works projects entitling it to attorney fees. In *Granite Construction Co. v. American Motorists Ins. Co.* (1994) 29 Cal.App.4th 658 (*Granite*), a sub-subcontractor in a new subdivision performed work for which it was not paid. The original contractor and subcontractor filed for bankruptcy. The surety refused payment. The sub-subcontractor filed suit against the surety and won a motion for summary judgment and award of attorney fees. (*Id*. at p. 661.) The surety appealed, contending the sub-subcontractor had not timely filed a requisite public works preliminary bond notice and was not entitled to attorney fees. (*Id*. at pp. 661-662.) The court of appeal affirmed the trial court's judgment. (*Id*. at p. 662.)

22

We find *Granite* distinguishable for several reasons. First, *Granite* fails to establish the factual predicate for determination in this case as to whether the streets paved and sealed by the sub-subcontractor were on-site or offsite improvements and whether they were required by the municipality. In fact, the surety's argument that the sub-subcontractor failed to timely serve a *public works* preliminary bond notice assumes the project was a public work required by the municipality. This differs from the instant case in which Suncal required the offsite landscaping, and no public works preliminary bond notice was apparently required. Second, the *Granite* court indicated it was limiting its analysis to the bond's provision for attorney fees. (*Granite*, *supra*, 29 Cal.App.4th at p. 667, fn. 7.) However, that provision, like the ones in the bonds at issue in this case, limited attorney fees to the municipality. (*Id*. at p. 668.) Thus, *Granite* did not abide by its own analytical framework.

Third, *Granite* provided no analysis of the competing statutory provisions for attorney fees with respect to subdivision improvements; thus, there was no indication as to whether the project at issue, like Avalon, would come within the purview of the Subdivision Map Act, which does not provide a statutory basis for attorney fees for subcontractors. Fourth, the surety in *Granite* did not contest the categorization of the sub-subcontractor's work as a public work and did not challenge its entitlement to attorney fees; rather, the surety challenged only the timeliness of sub-subcontractor's service of the *public works* preliminary bond notice and its entitlement to attorney fees prior to initiation of suit against the surety. Thus, because the court did not consider whether the sub-subcontractor's performance was a public work or whether it was

23

entitled to attorney fees after initiation of the suit, its holding is, at best, weak dictum for the proposition that subcontractors are always entitled to attorney fees upon successful suit against a surety.

In *California Paving & Grading Co., Inc. v. Lincoln General Ins. Co.* (2012) 206 Cal.App.4th 36 (*California Paving*), the developer entered into a SIA with a municipality that required, as a condition of its approval, the developer install all public improvements required by the final map. The City required a 50 percent L&M bond for the public improvements. The developer contracted with a general contractor for construction of the improvements. (*Id*. at p. 38.) The general contractor subcontracted for the paving and asphalt work. The subcontractor performed the work but was never paid. The subcontractor filed suit against the developer and the general contractor, but both filed for bankruptcy. The subcontractor then filed suit against the surety. (*Id*. at p. 39.)

The surety demurred contending the subcontractor had failed to file suit within the statutory timeframe. (*California Paving*, *supra*, 206 Cal.App.4th at pp. 39-40.) The subcontractor countered that, "the improvements for which the bond was issued are subdivision improvements, not a public work within the meaning of the Civil Code sections. Therefore, the payment bond is not a public works payment bond and the statute of limitations set forth in [former Civil Code] section 3249 does not apply to this action." The trial court sustained the demurrer. (*Id*. at p. 40.)

The appellate court reversed, holding the "subdivision improvement work constituted a public work within the meaning of [Civil Code] section 3100 because it constituted a 'work of improvement contracted for by a public entity.'" (*California*

24

*Paving*, *supra*, 206 Cal.App.4th at p. 43.) Indeed, the SIA and contract between the City and the developer "expressly required [the developer], at its 'own cost and expense, *to construct and install all public improvements* required in and adjoining and covered by the final map.'" (*Ibid*.) The general contractor then contracted with the subcontractor "'to furnish labor, services, equipment and materials required pursuant to the prime contract for the construction of the PUBLIC IMPROVEMENTS.'" (*Ibid*.)

Nissho fails to cite any provision in either the SIA or the contracts between it and Suncal where any of the contracted work was designated as a "public improvement." This is a dispositive difference between the instant case and *California Paving* where the words "public improvements" in the various contracts and agreements were emphasized. Moreover, here, Suncal and City did not enter into any direct contract with one another, unlike in *California Paving*. Thus, City was not a party to any construction contract executed by Suncal, the general contractor, or Nissho. Finally, unlike in *California Paving* with respect to the street paving and asphalt work, City did not require the offsite landscaping performed by Nissho as a condition for approval of the SIA. Rather, Suncal proposed the offsite landscaping to which City acquiesced. Therefore, the offsite landscaping was not a public works improvement and Nissho was not entitled to an award of attorney fees.

**DISPOSITION**

The judgment awarding Nissho $1,041,148.55 plus costs and interest from January 2008 is reversed. The matter is remanded with directions to the trial court to determine what amount of damages Nissho may recover up to the penal limit of $566,200 on the

25

Offsite Bond.  The trial court is further directed to determine whether Nissho may recover costs and interest if the inclusion of such further costs exceeds the penal amount of the Offsite Bond.  The trial court's judgment denying Nissho's motion for attorney fees is affirmed.  Defendant and appellant Bond Safeguard Insurance Company is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION

MILLER

J.

We concur:

RAMIREZ

P. J.

McKINSTER

J.